Next case up, Patterson v. Walgreen. Patterson v. Walgreen. Patterson v. Walgreen. Good morning, Your Honors. I'm Gene Scherer and I'm honored to appear here before this panel on behalf of Darrell Patterson. This is an important religious freedom case, not just for him, but for all working people of faith throughout this circuit. And its importance stems from and is illustrated by the serious legal errors that the district court made in resolving the three core issues that I'd like to briefly address today. First the reasonable accommodation issue, then undue hardship, and finally whether summary judgment on an accommodation claim requires summary judgment on all other claims that are based on similar facts. As to the accommodation claim, let me begin by giving Walgreens its due and by acknowledging the admirable accommodations that were made by some Walgreens officers early in Darrell's employ, but people who were gone by August 20th of 2011 when the critical events in this case happened. The first such Walgreens officer was Roberto Lee, the HR manager who actually hired Darrell and who told him that his religious need to avoid work from sundown Friday to Saturday quote, would not be a problem whatsoever. That's at page 15 of Darrell's . . . I'm not sure I understand why you're going there other than to show how reasonable you are and I'm not sure we have time for that. Let me ask you one thing I couldn't tell really, was not clear to me from the brief. Perlene Davidson's offer to work for the plaintiff, the training was supposed to start that morning, right? Correct. Then she offered at 11.15 after he didn't appear. Is there anything in the record, summary judgment record, about how long it was expected the training would take? Yes, and I can get specific sites on rebuttal, but it's undisputed that it was a two-hour training session that was scheduled to start at 11.30. Perlene Davidson testified that yes, she offered to come in and cover the training. The manager who was on duty, Ms. Rodriguez, Davidson offered that at 11.15. The manager on duty, Ms. Rodriguez, said, I can go ahead and handle this. It's not scheduled to start for another 15 minutes. I can handle it. You don't need to come in. I assume Elizabeth Rodriguez's deposition was taken, correct? Yes. Why . . . surely she was asked, why did you reject that offer? Well, she explained to Perlene at the time that she could go ahead and handle the training . . . I'm not asking what she told Ms. Davidson at the time. I'm asking why she rejected the offer in terms of not handling it. Why did she say, I'll handle it, and then her handling of it was to fire the plaintiff, or lead to the firing of the plaintiff? Well, I don't think she ever said exactly why she rejected the offer. I assume it was just because she didn't want to put Perlene to the inconvenience of having to drive into the office. Y'all never asked that. I'm sorry? You never asked that in the deposition. Did I? Why she rejected the offer. Why we didn't ask that? No, you never asked that in the deposition, question mark. I'm not sure whether we did or not, but I'll find out before rebuttal. But you're right. Unfortunately, and the reason that we're here today is that despite earlier accommodations, and another person who was willing to accommodate Daryl was Caroline Scott, who was Perlene's supervisor. But she left shortly before Daryl's firing. So by the time August 20th rolls around, the two decision makers were Caroline Davidson and Carol White, the HR manager. And they took a hard-nosed position that in Davidson's words, and this is at page 11 of her deposition, she said, Walgreens doesn't accommodate religious accommodations. And that was apparently based on a legal judgment that they had gotten from somebody, as Davidson acknowledged at page 12 of her deposition, that there is, quote, no legal duty or requirement that you accommodate anyone's religion in the workplace. So let me ask you this, though. Without respect to what she said, why under cases of ours like Morissette Brown and Beadle isn't it enough that they offered him the opportunity to swap shifts? I mean, the way that I read Morissette Brown, it seems like what you're saying is not enough to allow him the opportunity to swap shifts. You, employer, have to facilitate the swapping of shifts. But as I read Morissette Brown, we basically said, wrong. It's enough to allow the employee the opportunity to swap. And we quoted some Tenth Circuit case that said it would be unreasonable to require the employer to go farther. Well, a couple of distinctions, Your Honor. Morissette Brown was decided after a full trial, a full bench trial, and this court addressed it under a clear error standard. But that still sounds like a legal conclusion, right? I mean, what's the duty of the employer? Is it to allow the swapping of shifts or to facilitate, to ensure the swapping of shifts? And it sounds like we said allow. It's a matter of law. Well, I don't think the court said that as a matter of law, any allowance of swapping is enough. And this case illustrates why that wouldn't be adequate because in this case, Darrell took full advantage of the opportunity that he had been given to swap. In fact, Kurleen discouraged him from swapping with the one other person that she had said previously he was allowed to swap with, which was the other trainer, Ms. Alsbaugh. Kurleen discouraged him from doing that, but he still did it anyway, and then that proved to be not enough. He then, in a sense, he tried to do another swap with Davidson herself, right, by telling her that, you know, that he wasn't going to be able to come in that day. And then, of course, she actually offered to come in, and a company representative refused that offer. So at a minimum, there was a he really didn't have a fair opportunity to swap because the company rejected the swap that he was sort of able to arrange through Davidson. Although doesn't the other side say that there were a couple of other options that he didn't explore? And who were those people, and why weren't they viable? After, I guess I mean after Alsbaugh, but before Davidson. They weren't viable because Davidson had previously told him specifically, if you want to swap, you have to swap with somebody else on your level, your level of seniority. And the only other person that satisfied that was Alsbaugh, and then in addition to Davidson herself. He tried to call Davidson but used the wrong telephone, right? Well, he called her on her cell phone, and that was a number that she had given to her subordinates previously. Now, they claim that that was her personal cell phone rather than her work cell phone, but that was a number that she had given them to call her on. But in addition to that call to her cell phone, it's undisputed that at 7.30 the next morning, he called and left a message on her office line and said, look, it's my Sabbath. I'm not going to be able to come in today. You know, the implication being, you know, if you're relying on me to go forward with this training, we're not going to be able to do it. So I think Davidson's misunderstanding of the law probably explains why she and the company ultimately refused to accommodate Darryl on August 20th. And, of course, that's the heart of this case. And Walgreens, like the district court, strives mightily to avoid talking about what actually happened on August 20th. And why is that? Because Walgreens never offered Darryl any accommodation at all as to that day, much less a reasonable accommodation. And it's also undisputed that, as Davidson admitted at page 28 of her deposition, that she and White, after those events were concluded, they elected to discipline Darryl and with a far harsher punishment than if he had simply missed for another reason, like sleeping in. And now, yes, it's true that the district court also found that Walgreens had often been willing to let Darryl arrange swaps in the past. But obviously, if you violate the law on day 10, compliance with the law on days 1 through 9 doesn't excuse the subsequent violation. And the district court also pointed to Walgreens' offer to send Darryl back to the ranks of the customer care representatives. But that, of course, would have involved more than a 50% pay cut. And he also had the assurance from the HR supervisor, White, and this is at pages 47 and 48 of Darryl's deposition, that accepting that change would not even mean that he could keep his Sabbath. He specifically asked her that. If I change, can I keep my Sabbath? And she answered unequivocally no. So obviously, even if he had taken the CCR job, that would have been an adverse employment consequence subject to Title VII. Can I ask you a question? So given the circumstances, what should Walgreens have done? You know, there's this case in the Supreme Court, Hardison, I think maybe, that says you don't have to accommodate religious employees at the expense of others. Right. And so if the only alternative here was all spalls, she can't do it for valid reasons, I guess. Davidson is the only other alternative. What should Walgreens have done? Well, the record shows that there were a number of other options. There were other people who could actually have substituted for him that day. There was Davidson. There was also Shepard. Darryl wasn't allowed to ask Shepard, but Shepard testified that he could have substituted. Liz Rodriguez herself said that she could substitute. And ultimately, she did kind of substitute for him. But that all assumes that this training actually had to happen on that Saturday morning. There's also lots of evidence in the record that they could have pushed that training off to Sunday and let Darryl do that training. It was just a two-hour training. Do that training along with the three-hour training that he was scheduled to do on Sunday. Or they could have scheduled it for Monday when it was actually completed. But you're talking about everybody who had to be trained and had to be there while they were being trained being pushed off another day. I don't think that case law requires that kind of accommodation. I can understand allowing voluntary swaps, but telling everybody, I know we scheduled you for Saturday, but we're going to move that entire training session to Sunday to accommodate one employee. I don't think is a reasonable accommodation. Well, they could have done the accommodation before they even scheduled the training, right? Darryl had just had a performance review with Davidson two weeks before this in which she had said, I think you need to be willing to be more flexible in your scheduling. I don't think an employer, if we've ever helped an employer, has to schedule work around one particular employee's religious beliefs. That doesn't sound to me like anything that the law would require from the cases I've read. All I'm doing, Your Honor, is just answering the question about what other options they had. And they did have other options to accommodate them. I understand. But if the law doesn't require those particular options to be used, I don't see how that's something that they can be held responsible for not considering or not offering. I understand, Your Honor. What the law requires is that the employer offer a reasonable accommodation. And as to August 20th, the record is clear that there was no accommodation of any kind offered to Darryl Patterson. There were other things the company could have done. Maybe they weren't legally required. But the legal requirement is that the company offer a reasonable accommodation when the work-religion conflict comes up. And that simply didn't happen here as to August 20th. Is there any accommodation in your mind short of a guarantee to Darryl you'll never have to work on Saturday that's reasonable? In this particular case, we're not asking for a guarantee. I'm trying to figure out, I guess, what you are asking for, if not a guarantee. Well, all we're asking for is what the law requires, which is when a work-religion conflict comes up, the employer has to be willing to offer a reasonable accommodation as to that particular conflict. It's not good enough to say, well, we accommodated you in the past, and so we satisfy the obligation. And it's not good enough to say, well, in the future, we'll accommodate you. Whenever the work-religion conflict comes up, the employer has to offer a reasonable accommodation, and obviously the employee has to be willing to cooperate with it. But it sort of feels like you're asking for a guarantee here because here the conflict did materialize, and you told me that it's not enough, even under Morissette Brown, for Walgreens to allow Darryl to pursue his own shift swaps. Instead, really it sounds like they either needed to compel Allspot to do it over her child care needs, or Davidson had to do it, or Shepard had to do it, or they had to postpone it. Anything to keep Darryl from having to work on Saturday. That's not our position, Your Honor. Another option would have been for them to simply tell him, look, if Allspot can't do it, we'll also let you approach Shepard and Davidson and Rodriguez, and the record is that any of those three could have done it. The problem was that Davidson had told him you can only seek a swap from Allspot. Those other two were capable of leading this training session, Rodriguez and Shepard? Yes, and the record's clear on that. Absolutely. That's exactly right, Your Honor. Okay, counsel, we'll give you a full three on the fly-off. Mr. Hearing? Thank you. Thank you, Your Honor. Greg Hearing and Benjamin Bard on behalf of Walgreens Co. Let me answer some of these questions, if I could, for Your Honors, directly. Judge Carnes, you asked about whether Ms. Rodriguez was deposed. In fact, she was not deposed. The evidence that we have in the record about what she did comes from Ms. Davidson, who was deposed. Ms. Davidson testified that Ms. Rodriguez had to undertake study time, and Ms. Davidson also testified, it's undisputed . . . Had to undertake study time. That they simply did self-study. They looked at the training materials. Was she qualified to take his place? There's no record evidence, Your Honor, that she was qualified to . . . What did Ms. Davidson say about whether or not Ms. Rodriguez was qualified? That she was not. She was the operations manager. Ms. Davidson was the training manager, and the plaintiff, Mr. Patterson, was the training instructor. So you're telling us the summary judgment record will show that Rodriguez was not a viable option? That's correct. What was wrong with Carleen Davidson as a substitute, if you understood from the plaintiff that she was willing to do that? Presumably, that's why he called her Friday night and called her cell phone, was to say, I'm not going to go and see if she would offer. She was his boss, remember? Certainly, she would be qualified to do it and could do it. And then he called her . . . I just want to be clear, because there's a question about the cell phone. He called her personal cell, and the record is clear that they were to call her business cell. She didn't pick up the personal cell message until after the training was scheduled to have started. And she could have, in fact, come in. But Ms. Rodriguez said, well, I've had them do this study time. That was the testimony. Had who do that? Had the class use it as study time, because they had to get another class in there. What time? It was scheduled to begin at 11 a.m., was it not? I think it was 11.30, close enough, Your Honor. Yes, sir. When did Ms. Davidson come in, or when could she have come in? She didn't learn that Mr. Patterson did not show up until after 11.30 that day on Saturday. All right, but 11.32 is after 11.30, as is 4.30 p.m. And I don't know that . . . the record may show the exact time. I don't know it that well to tell you, but it should be in her deposition. But the point, I think, is that this is all a red herring by Mr. Patterson, because what happened was he was given the opportunity to get someone to cover it. And as Judge Newsom said, the Beadle decision, the Hardison decision, says that the statutory inquiry ends, because then otherwise you are telling someone who has firmly held religious beliefs that their beliefs are more important than the secular beliefs or reasons why somebody else might not want to work. The inquiry doesn't end, because if you offer somebody that option and they arrange that option and then you reject it, that is not accommodation. But that was not the option that was, in fact, arranged. But you said it ends when you tell somebody they can arrange a substitute. It doesn't end then. You've got to look and see if they found a substitute that was reasonably available and if the company unreasonably rejected the swap that they had told the employee the employee could make. Well, respectfully, we believe that because there's no guaranteed elimination of the conflict, that if you give an opportunity to eliminate the conflict, you have met your duty. It has to be a real opportunity. You can't say go arrange a swap, then when they arrange a viable swap say no. I'm just simply rejecting your assertion that all you have to do is say you can arrange a swap. I understand. You don't have to. I mean you do have to do more than that. Yes, sir. Which is be open to any reasonable swap. Absolutely. We're down into the weeds about whether this Davidson coming in late or being contacted late and then calling Rodriguez late was a reasonable rejection of the swap. Yes, sir. I'm not artfully stating my position. I agree with you that you can't just say this is the one option and it's not a viable option. In fact, that's what happened with why the Tenth Circuit reversed that Tabora decision. There are factual questions about that. Here, though, I want to be clear that what our position is is that Beadle makes it clear that there . . . and Judge Wilson had this case when he was a magistrate judge. My firm handled that case. I'm very familiar with it. He was a detention deputy and they had a neutral scheduling system and they had the ability . . . they gave him the ability to swap. He argued to Judge Wilson that the employer had to do more than just give him an opportunity to swap. They had to facilitate the swap. And Judge Wilson and this court rejected that argument that they had to facilitate it. And that answers your question, Judge Newsom, that they have to give the opportunity. It has to be a real opportunity, Judge Carnes. Absolutely it has to be or else it's not a reasonable accommodation. What about the quotation he refers to, we don't have to accommodate irreligion or religion? That's . . . Ms. Davidson said that and, you know, number one, whether that's actually admissible or not because there's objections they weren't ruled upon. But looking at the evidence in the light most favorable, Judge Sharp considered that and pointed out that she went on to say she's unaware of any policy against that. But what that language means is that we don't do it as a matter of always doing it. That it has to be done. In fact, what happens is we are, you know, Walgreens can offer accommodation but if it's not going to be a reasonable one then, in fact, it doesn't . . . The quotation, as I understood it, could have been paraphrased, was we don't have to offer you any accommodation. The . . . well, again, the lack of artfulness as to say that we have to eliminate the conflict, which is essentially what . . . remember, this is in the context of a conversation that he says that what I want is I need to have the Sabbath off. I have to have that. And I want a guarantee of that. And this was in the context of a conversation with when he had missed a day and he had been offered, well, you can go back to the CCR position where the undisputed evidence is that he never had a problem with getting a swap or you can look at other positions within Walgreens. We'll facilitate that and help you do that. And his question, the only question he asked was, well, I have a guarantee that I won't have to work the Sabbath. And Carol White did say, I can't guarantee that. No, you won't have that because we don't know what all the circumstances . . . It's phrasing, of course, what his phrasing of it was. You want to talk about guarantees, of course. Straw man, knock it down. Okay. But what he's saying is he said we don't have to accommodate. And . . . What do you thought your response to that would be? It doesn't matter what she said. The question was whether they attempted to accommodate him or not. It's the red herring. Again, most of these red herring arguments is that the court looked at it because it needed to. But the court knocked it down quickly because the record evidence is he had been accommodated and he was offered accommodations. She can be wrong, but that doesn't raise a material question of fact. And especially when it's followed in the context with Ms. Davidson in the room with Ms. White saying, we're offering you these other accommodations. So that is something that doesn't warrant a trial, a remand for a trial, just because she said that. And Judge Sharp took care of that. And this thing about the CCR, because I think we're going to get some argument about it. We certainly got it in the brief, the CCR position. There's some contention that that is a 50% reduction in pay. But there's no record evidence of that. But let's assume that it is. There's no authority that they cite that say that that's an unreasonable accommodation. In fact, we cite authority from this circuit, Your Honors, that says that it can be a reasonable accommodation, a reduction in pay. But these things all ignore the fact that an offer was made to look at finding another position for him. So even sweep aside the CCR position because of the 50% pay question or not, even though it's not in the record yet, that question wasn't asked by the plaintiff. He didn't say what is the pay or what are the duties and responsibilities. All he wanted to know is that I have a guarantee that I will be able to honor the Sabbath. He suggested that Walgreens could have put both of those training sessions on Sunday. What would be wrong with that? He can't tell the employer that's unreasonable as a matter of law to tell the employer how to run its business. They were all supposed to be there on Sunday anyway, weren't they? They were because they had an emergency situation. They had training on Saturday and Sunday and then Monday and then Tuesday because the Alabama Center was being closed by the Board of Pharmacy help in Alabama, and it was an emergent situation. And this is why the law says that you don't have to accommodate at all costs. You simply have to offer a reasonable accommodation. He not only received one but multiple attempts. In fact, the record is replete with a history of accommodation of this gentleman, including changing the scheduling of trainers in the past. But that's back when there were more trainers. The new business needs of the company were that the WHI business was being spun off, and Ms. Alsbaugh, the other trainer, was going with that business, and he was the only trainer left. So they met with him and asked, are you going to be able to work the Sabbath if there's an emergent situation or the need? And he said, I won't. And then they said the CCR, they said other positions, and he said, I won't do it. How much notice did they give on this, setting this up? One day. It was the 19th, because the company received very short notice from Alabama. So the 19th. And then what I want to be clear about that is he did have options to call other people. He admitted, he testified that he had other people that he could have called, but he didn't call them. He only called Ms. Alsbaugh. Could he have called Shepard? Yes. Didn't do it. And he only called Alsbaugh, and Alsbaugh, the record is undisputed that Alsbaugh at first didn't answer, but then later that night said, I've got child care issues, I can't do it. And then he called Davidson that night on a personal cell, left a message, said he's not going, but didn't ask her if she would cover it. That's undisputed. She doesn't pick that up until after the training starts on Saturday, and then she contacts and has a discussion with Rodriguez, which we've already discussed. So let me ask you this just before you move on, just so I understand. So among the other plausible alternatives, I think Mr. Scher said that he couldn't, he had been instructed not to call Shepard. Is that not right? That comes from his EEOC statement, which is attached to his deposition, which is a statement that he gave to the EEOC, which is hearsay and not admissible. But he does say it is in the record that he said that in the EEOC statement. But that is certainly contrary to what the rest of all the record evidence is. I thought the law in our circuit was, in fact, I'm phrasing that rhetorically, the law in our circuit is that hearsay statements are admissible at summary judgment if they're reducible to testimony at trial. So I'm not going to argue with that, Judge, because, again, I think this is a red herring as to whether Shepard was told that or not, because he was told that he could call other people. That's undisputed. And he called. A company can't offer as an alternative if he didn't pursue one that he was directed by the company not to pursue, to which Shepard as an alternative. But we didn't. What we offered to him. Okay, so you're not contending he could have called Shepard? I'm not. That's not our case, Judge. Okay. Absolutely. I think, again, that's a side issue. Our case is that he was told, and he knew it, because he didn't have to call Curleen Davidson or anybody else before he called Ms. Alsbaugh. He knew he could call other people, and that's the point. Again, he had an opportunity, a reasonable opportunity, to accommodate this. We can't guarantee that everybody's going to say, yes, I'll work. Otherwise, that elevates his interests over theirs. That's what he wanted. That's why he was separated. He's tried to recast it to say that it's a discipline for missing one day, a two-hour training session. That's good advocacy, but that's not what the law says. In this case, it was, under these facts, he was given multiple opportunities. They did not say, you're just fired because you missed it. They said, we have to fix this, and gave him opportunities. He refused to pursue those opportunities. Where I was going to go with that point is that, as a matter of law, requiring employees to pick up the slack of another religious employee, requiring them to do that, as a matter of a law, is undue hardship, because part of their argument also is that the district court erred in finding undue hardship. They want to argue, well, is there a cost, or could they have flown somebody in, or what? That's all because that's a question of fact. There's no question of fact. It's a question of law that he wanted to guarantee that somebody was going to have to cover him. As a matter of law, Hardison says it. Beadle says it. The Howard decision from the Middle District of Florida says it. The AT&T decision says it. The Telfair decision here from the Eleventh Circuit says it, that you do not . . . Title VII doesn't require that unequal treatment of elevating the needs of religious employees over the secular needs of non-religious employees. The final points I'd like to make about that is the undisputed record evidence here that supports what Judge Sharp did. Instead of going to these side issues of what could have, should have, all this Monday morning quarterbacking afterwards, the real issue is what were the opportunities, not what actually happened. The opportunities are undisputed. We can argue about how many different opportunities, but remember the law is that he doesn't get the accommodation of his choice. He's only entitled to a reasonable accommodation. Once that is offered, that's where I suggest that Ansonio says that the inquiry should end, because otherwise then the court is getting into the business of whether a religious employee's needs are paramount or superior to non-religious employees' but very important needs to, say, have child care or if they have another job on the weekend that they have to have to be able to pay their rent. That's why there is a limit to this. The Abercrombie decision, which they argue in their brief, changes that, didn't change that. The Tabura decision, in fact, says that they're not entitled to eliminate the conflict, and that's what they wanted here. Judge Sharp saw that and concluded, based upon well-settled precedent that your Honors are familiar with, the Morset-Brown decision and Beadle, and in the last cases, that Walden v. Centers for Disease Control, which just came from the 11th Circuit just a few years ago, where that person was given the opportunity to look for other jobs, and this Circuit said, that's enough. Respectfully, your Honors, while you might be tempted to go down the bunny trails of some of these factual issues, they're not genuine material issues of fact, because there is no dispute as to what the accommodations were that were offered. He admitted it. The three people that were in that meeting have all been deposed. The record is full on that, and you have it before you. With that, we'd ask that you would affirm the District Court's summary judgment order on appeal. Thank you for your time and your great attention to this case. Thank you, Mr. Hearing. Mr. Sher, a few minutes. Thank you, Your Honor. First of all, I apologize for misstating whether Rodriguez was deposed. She was not, in fact, deposed, but we do have the evidence of what she said and that interaction with Curley and Davis from Davidson's deposition. And Davidson's deposition at page 31 says that Davidson talked to Rodriguez at 1115 that Saturday morning, and the training was scheduled for 1130. So there was ample time that she could have come in. I want to back up for just a minute to an overarching point here, and that is that we just heard multiple times that if Darrell Patterson were given an accommodation here or if he were to win this case or get an opportunity for trial, that that would somehow place the interests of religious employees above other secular interests. Abercrombie held, in fact, that the rights of religious employees to practice their faith in the workplace are, in fact, favored over secular interest. That was the whole point of Title VII. That does not mean in determining whether an accommodation is reasonable, you must always decide in favor of the religious belief and tell the woman who needs childcare, that's tough, call your mother-in-law, maybe she can handle it, but you've got to be here so he can observe his Sabbath. Absolutely, and we don't fault Walgreens. That's what we're talking about here. We don't fault Walgreens for not forcing Allsbaugh to come in, but there were other options. And, in fact, one of those options would have been Shepard if Davidson had modified her instruction to Darrell that he could use people other than Allsbaugh as a swap. And, in fact, in Darrell's deposition at page 48, he talks about that restriction that she had put on his ability to seek out other swaps, and he was told that you can only seek swaps for people that are at your same level. And Shepard was not at his same level, though he testified he could have done it. Rodriguez was at a different level, although she said she could have done it as well. So that was the problem, was the restriction that was placed on his ability to seek swaps. Can I ask you a quick question, an actual question? Yes. So you do say a number of times in your brief that going back to the CCR pool would have required a 50 percent pay cut. The other side says there's nothing in the record to support that number. Can you just point me? I had a hard time finding it myself. Can you just point me to a record citation where I can verify the 50 percent? Well, you can infer it from facts that are in the record. And, of course, they haven't disputed that it would have been more than a 50 percent pay cut. They're complaining that it's not in the record, but they haven't disputed that that would be the reality. The record does say that when Darrell started as a CCR representative, he was making $9.75 an hour, which worked out to about $20,000 a year, as I recall. And then the record also shows his deposition indicates that he was being paid $58,000 a year when he was terminated. So that's about three times what he was making as a CCR representative. So you can easily infer from that that it would have been a big pay cut. Thank you, Counsel. Got you. Thank you. We're going to take a ten-minute break before we get to Tim Lister.